UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | NO. 3:21-cr-00146 |
|  | ) |  |
| JUSTIN HICKMAN, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

MEMORANDUM OPINION

Before the Court is the Government's Motion for Involuntary Medication to Restore Defendant to Competency (Doc. No. 60). Following the evidentiary hearing, the parties filed post-hearing briefs (Doc. Nos. 68 and 71). For the following reasons, the Court will grant the Government's Motion (Doc. No. 60).

I. FACTUAL AND PROCEDURAL BACKGROUND

Justin Hickman was indicted on one count of bank robbery in violation of 18 U.S.C. § 2113(a). (Doc. No. 11). If convicted, he faces a maximum sentence of 20 years imprisonment. 18 U.S.C. § 2113(a). "[B]ased on the parties concerns and statements made by Defendant at the hearing," the Court ordered a competency evaluation pursuant to 18 U.S.C. § 4241. (Doc. No. 20 at 1–2).

The evaluation was performed by Dr. Mary Wood of Vanderbilt University Medical Center. (See Doc. Nos. 22-1, 29-1). She diagnosed Hickman with "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder" and concluded that "medication intervention may be required to address [his] competence-related deficits." (Doc. No. 29-1 at 5, 12). Based on Dr. Wood's evaluation, a competency hearing was scheduled pursuant to 18 U.S.C. §§ 4241(c) and

4247(d). (See Doc. No. 37 at 1). The Court found that Hickman "presently suffer[ed] from a mental disease or defect rendering him mentally incompetent[,]" and committed him to the custody of the Attorney General "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." Id.

Hickman was admitted to the Mental Health Unit of the Federal Medical Center in Butner, North Carolina ("Butner") for evaluation by Dr. Marina Mukhin, a forensic psychologist. Like Dr. Wood, Dr. Mukhin diagnosed Hickman with "unspecified schizophrenia spectrum and other psychotic disorders." (Doc. No. 46 at 11). Throughout the course of her evaluation, Hickman declined to participate in psychological testing, denied having mental health issues and refused attempts to treat his mental illness, including antipsychotic medication and therapy. (Id. at 8-11). Dr. Mukhin concluded that Hickman "is currently suffering from a mental disease or defect which continues to render him not competent to stand trial. . . . [And] a substantial probability exists that [his] competency to stand trial can be restored with appropriate treatment with antipsychotic medicine." (Id. at 13).

Dr. Mukhin also noted that "Mr. Hickman's potential suitability for civil commitment pursuant to § 4246 was completed on 01/26/23[, and b]ased on the information available . . . a certificate of dangerousness was recommended to be filed . . . for further evaluation." (Id. at 14). A Certificate of Mental Disease or Defect and Dangerousness ("Certificate") was filed in the Eastern District of North Carolina pursuant to 18 U.S.C. § 4246. (Doc. No. 51 at 1). Per the Certificate:

> The FMC-Butner forensic staff believe that Mr. Hickman is currently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another. In addition, suitable arrangements for State custody and care of Mr. Hickman are not available. Pursuant to Title 18 U.S.C. § 4246(a), I hereby request

2

that a hearing be scheduled to determine whether Mr. Hickman should remain committed to the Mental Health Department at FMC-Butner.

(Id. at 5).

Following Dr. Mukhin's evaluation (Doc. No. 46), the Government moved for a proposed treatment plan for the involuntary medication to restore Hickman's competency, (Doc. No. 47), which Hickman opposed. (Doc. No. 49). The Court granted the Government's request and directed Butner to produce an addendum "outlin[ing] in detail the proposed treatment plan to return [Hickman] to competency[.]" (Doc. No. 55 at 1). The forensic evaluation was issued by Dr. Charles A. Cloutier, a psychiatrist at Butner that included the "FMC Butner Sell Appendix 2021". (Doc. No. 58). He recommends administration of four antipsychotic medications: aripiprazole, haloperidol, risperidone, and/or paliperidone, (Id. at 4), and explains that:

> Administration of involuntary antipsychotic medication to Mr. Hickman is substantially likely to render him competent to stand trial and is substantially unlikely to interfere with his ability to assist his counsel . . . ; that less intrusive treatments are very unlikely to achieve the same results . . . ; and that it is clinically appropriate and indicated to treat Mr. Hickman's psychotic illness with antipsychotic medication . . . .

(Id.).

The Court held an evidentiary hearing pursuant to Sell v. United States, 539 U.S. 166 (2003) ("Sell Hearing"). Dr. Marina Mukhin was the only witness.

Dr. Mukhin has a doctoral degree in psychology with specialization in forensic psychology. She is a licensed clinical psychologist. She has worked as a psychologist in the Bureau of Prisons for approximately four years.

Her evaluation of Hickman began as soon as he arrived at Butner. He was initially receptive to discussion, but when he was informed that his participation was optional, he regularly

3

declined to meet with her. His engagement became limited thereafter. He refused to participate in weekly competency restoration group therapy and would not discuss medication or treatment.

Dr. Mukhin continued to observe Hickman's behavior at Butner. She testified credibly that Hickman's illness impaired his ability to rationally consider information presented to him. She referenced several occasions when Hickman acknowledged his attorney and Butner staff, but denied their actual existence because he believed them to be holograms. Overall, she concluded that additional treatment without medication would be ineffective. Her findings were consistent with those of Dr. Wood, who also reported that Hickman demonstrated delusional ideas. Dr. Mukhin reported that Hickman displayed no instances of violence or aggression towards others while at Butner and had not been a danger to anyone. Regarding the Certificate, she testified that it was merely to allow for further evaluation and served as a placeholder if his competence was to be found unrestorable.

Dr. Mukhin credibly testified at length about the proposed treatment plan to restore Hickman's competency, describing each antipsychotic medication recommended. Abilify (aripiprazole) is used to treat mood and psychotic disorders and is recommended because of Hickman's prior use. Haldol (haloperidol) is recommended due to its common use in treating the mental health illnesses suffered by Hickman. Similarly, Risperidone and Paliperidone, a metabolite of Risperidone, are commonly used to treat mental health disorders. Each medication is recommended for use, within a reasonable degree of medical certainty, and are likely to restore Hickman's competency.

Dr. Mukhin testified that although individual responses to antipsychotics vary, ample research supports the effectiveness of the recommended medications. Haldol has commonly been used in competency restoration for over 50 years. According to Dr. Mukhin, most persons who

4

are involuntarily treated with any antipsychotic medications are restored to competency. She is certain that at least one of the treatment plan's antipsychotics will bring some degree of improvement to Hickman's mental illness.

She also explained that the goal is to have Mr. Hickman agree to oral medication. If he did, he would be orally administered the Abilify, which he has tolerated in the past without unmanageable side effects. Hickman would initially be given small, daily doses of Abilify orally. Every four to seven days, his dose would increase by five milligrams, until he reaches the target dose between 15 and 20 milligrams daily. Haldol is also available in an oral form, which would be considered if Hickman agreed to take medication voluntarily and the initial administration of Abilify was ineffective. Oral administration of Haldol would be administered at an initial daily dosage of two milligrams, to be increased up to 20 milligrams daily.

If Hickman continues to refuse voluntary oral medication, however, he would be given the Haldol, intravenously. The first administration of Haldol would be a small, five milligram, short-acting dose to observe Hickman's ability to tolerate the medication without unmanageable side effects. Medical staff would monitor his EKGs, blood glucose levels, blood pressure, and other health metrics to ensure the medication has no adverse effect. If tolerated, he would then be given a long-acting form of Haldol in 50 milligram doses every four weeks. Dr. Cloutier may also adjust the amount or frequency of Haldol administered based on Hickman's response, potentially increasing the dosage by increments of 25 milligrams or the frequency of administration as medically necessary. The maximum dose would be up to 200 milligrams administered every two weeks.

If Haldol is ineffective or not tolerated by Hickman then Risperidone or Paliperidone would be administered. Both are available in oral and long-acting injectable forms. In their injectable

5

forms, Risperidone could be administered every two weeks and Paliperidone could be administered every three to four weeks, depending upon Hickman's response. Dr. Mukhin explained that both medications are similar in that Paliperidone is a metabolite of Risperidone. Risperidone would be utilized before Paliperidone, because it is more widely used in the normal course of treatment. Dr. Mukhin also confirmed that continual health monitoring and encouragement of voluntary medication would accompany any medication administered to Hickman.

Dr. Mukhin detailed the side effects of Abilify, Haldol, Risperidone, and Paliperidone. All four antipsychotics share many of the same side effects, including weight gain, nausea, constipation, increased blood glucose levels, fatigue, drowsiness, and restlessness. Each drug also has the same severe side effects, identified as involuntary muscle movements, including dyskinesias and drug-induced Parkinsonism, cardiac arrythmia, and neuroleptic malignant syndrome. Dr. Mukhin believes that the involuntary muscle movement side effects of these drugs can become painful but are rare. She also opined that cardiac arrythmia and neuroleptic malignant syndrome side effects can be life-threatening but are even less likely and considered very rare. She is confident that these risks can be offset by administering medication to target any side effect. The risk posed is further reduced by administering the lowest effective dose under constant monitoring. Starting with small, quick acting doses helps immediately identify any severe side effect. Such side effects can then be treated quickly.

## II.  LEGAL STANDARD

"When the government seeks to involuntarily medicate a mentally incompetent defendant to restore his competency for trial, the government's prosecutorial interest must be balanced against the defendant's significant liberty interest under the Constitution in avoiding the unwanted administration of antipsychotic drugs." United States v. Berry, 911 F.3d 354, 357 (6th Cir. 2018)

(quoting Sell v. United States, 539 U.S. 166, 178 (2003)) (internal quotation and punctuation marks omitted). To obtain an order for involuntary medication, the Government bears a significant burden to establish the four "Sell factors" by clear and convincing evidence: "(1) the existence of an 'important' governmental interest; (2) that involuntary medication will 'significantly further' the government interest; (3) that involuntary medication is 'necessary' to further those interests; and (4) that administration of the drugs must be 'medically appropriate' for the individual defendant." United States v. Green, 532 F.3d 538, 545 (6th Cir. 2008) (quoting Sell, 539 U.S. at 180–81).

### III. ANALYSIS

Based upon the entire record, the Court finds each Sell factor established by clear and convincing evidence.

A. Governmental Interest

"In order for important governmental interests to be at stake, the defendant must be charged with a serious crime, whether against person or property, the prosecution of which is needed to protect society's 'basic human need for security.'" Berry, 911 F.3d at 360 (quoting Sell, 539 U.S. at 180). To determine whether a crime is "serious" the Sixth Circuit looks to the maximum penalty authorized by statute. Green, 532 F.3d at 547–49. "This objective measure not only respects the legislature's fundamental role in determining the seriousness of a particular type of criminal behavior, but also reduces the potential for arbitrariness inherent in the consideration of more subjective factors." United States v. Mikulich, 732 F.3d 692, 696–97 (6th Cir. 2013).

If convicted of the bank robbery charged in the Indictment (Doc. No. 11), Hickman faces a maximum penalty of 20 years imprisonment. See 18 U.S.C. § 2113(a). Hickman concedes this is serious, (Doc. Nos. 49 at 2; 68 at 3), as he must, because offenses carrying a 20-year maximum sentence have been found to be "serious" to warrant involuntary medication. Indeed, the Sixth

7

Circuit finds "serious" the specific 20-year maximum sentence Hickman is subject to under 18 U.S.C. § 2113(a). United States v Grigsby, 712 F.3d 964, 969 (6th Cir. 2013) (determining that the government had an important interest in prosecuting an accused bank robber who faced a 20-year sentence under 18 U.S.C. § 2113(a)). Accord United States v. Evans, 404 F.3d 227, 238 (4th Cir. 2005) ("We think it beyond dispute that the Government does have an important interest in trying a defendant charged with a felony carrying a maximum punishment of 10 years imprisonment."); United States v. Duncan, 224 F. Supp. 3d 580, 584 (W.D. Ky. 2016) (citing Green, 532 F.3d at 547–48) (finding an offense carrying a maximum sentence of 10 years imprisonment to be "serious" in consideration of Sell).

However, the Court must also consider any special circumstances that undermine the important governmental interest. Sell, 539 U.S. at 180. Hickman argues, without any evidence, that the likelihood of his civil commitment, length of his pre-trial detention, and lack of dangerousness undermine the government's interest. (Doc. Nos. 68 at 3; 49 at 2–4). These arguments are unavailing.

### Likelihood of Civil Commitment

Civil commitment can "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Sell, 539 U.S. at 180. However, it is not "a substitute for a criminal trial" as the "potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." Id. "[T]he government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain." Berry, 911 F.3d at 365 (quoting Mikulich, 732 F.3d at 699). While certainty of civil commitment is not required, the "mere uncertain possibility of civil commitment is not enough." Id.

Hickman relies solely on the Certificate. Yet Dr. Mukhin puts the Certificate in proper context. She explained, several times, that the Certificate served only as a placeholder for further

8

evaluation to potentially seek civil commitment if Hickman's competency was found unrestorable. Butner's issuance of the Certificate does not raise the likelihood of Hickman's civil commitment beyond speculation. Even the Government, (see Doc. No. 51 at 2–3), concedes that this "is, at best, an uncertain prospect." (Doc. No. 71 at 2).

Hickman urges the Court to follow Grigsby, but in that case the Sixth Circuit reversed and remanded a district court's decision to involuntarily medicate a defendant because the district court did not consider the two separate avenues for civil commitment under 18 U.S.C. §§ 4243 and 4246. 712 F.3d at 971. Civil commitment depends on the person being a risk of danger to himself, others, or property, see 18 U.S.C. §§ 4246(a) and 4246(d), and as Dr. Mukhin opined, "there is no convincing evidence Mr. Hickman currently poses a substantial risk of dangerousness in the current conditions of his confinement at FMC Butner." (Doc. No. 46 at 13–14). At the Sell Hearing, she testified that Hickman had no instances of violence and was not a danger to any staff members or inmates at Butner.[1]

### Length of Pre-Trial Detainment

"[A] lengthy pre-trial confinement which would be credited against 'any sentence ultimately imposed' undercuts the government's interest in prosecution." Berry, 911 F.3d at 362 (quoting Sell, 539 U.S. at 181). In other words, "[w]here a defendant has already served sufficient time that a guilty verdict will result only in a sentence of time served, the deterrent effect of imprisonment has evaporated, and the overall governmental interest in prosecution is weakened." Id. at 363. In analyzing this factor, the Court may consider the anticipated Guidelines

---

[1] The only indicia of violence within Hickman's record is where he allegedly "displayed a knife" during the robbery charged in the Indictment (Doc. No. 11). (See Doc. No. 46 at 7). However, there is no evidence that he used, threatened use, or otherwise brandished this knife. (See generally Doc. Nos. 29-1, 46 and 58). His criminal record is otherwise non-violent. (See Doc. No. 46 at 6–7).

9

sentencing range, the sentencing factors under 18 U.S.C. § 3553(a), and "the realities of an individual defendant's likely actual sentence." Id.; Grigsby, 712 F.3d at 972–74.

No reliable evidence of Hickman's potential sentence has been offered. Hickman suggests a sentence of approximately five years. However, this estimate is entirely speculative, as he provides no basis under 18 U.S.C. § 3553(a), or under the Sentencing Commission Guidelines. The five-year estimate is seemingly plucked from thin air. The length of Hickman's pre-trial detainment does not undercut the Government's prosecutorial interest.

### Lack of Dangerousness

A defendant's lack of dangerousness may also constitute a mitigating factor. Berry, 911 F.3d at 364–65. Hickman argues that his lack of dangerous weighs against the government's interest. (Doc. No. 68 at 3). The Court agrees. That he "poses no appreciable risk to himself or others undercuts the governmental interest necessary to medicate him. . . . [But n]o factor on its own outweighs the governmental interest[.]" Berry, 911 F.3d at 365–66.

B. Involuntary Medication Furthers the Government's Interest

Once the Court finds that an important government interest exists, it must also find "that involuntary medication will *significantly further* those" interests. Sell, 539 U.S. at 181. To this end, involuntary medication must be (1) "substantially likely to render the defendant competent to stand trial," but also (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Id. The test as phrased by the Sixth Circuit is that "[t]he standard is not certainty, but rather substantial probability" that the defendant would be restored to competency without unmanageable side effects. United States v. Payne, 539 F.3d 505, 509 (6th Cir. 2008). The evidence before the Court easily satisfies that standard.

1. Involuntary Medication is Substantially Likely to Render Hickman Competent to Stand Trial.

Hickman's argues that there is "insufficient evidence that the proposed treatment plan is substantially likely to render [himself] competent," (Doc. No. 68 at 4), ignores the record that clearly says otherwise. According to Dr. Cloutier, Hickman is within the population of patients with a 70–80% chance of attaining competency with antipsychotic medication. (Doc. No. 58 at 4). Dr. Mukhin agrees and concludes that approximately 79% of individuals subjected to involuntary medication are restored to competency through antipsychotic medication. Indeed, for Hickman, restoration of competency is likely to a reasonable degree of medical certainty. Ultimately, Drs. Cloutier, Mukhin, and Wood each found antipsychotic medication substantially likely to render Hickman competent. (See Doc. Nos. 58 at 5 ("[I]t is my medical opinion that: Administration of involuntary antipsychotic medication to Mr. Hickman is substantially likely to render him competent to stand trial . . . ."); 46 at 13 ("[A] substantial probability exists that Mr. Hickman's competency to stand trial can be restored with appropriate treatment with antipsychotic medicine."); 29-1 at 8 ("[I]t is my opinion that Mr. Hickman could likely be restored to competence following initiation of psychiatric medication targeting his symptoms.")).

Hickman's contention that the "duration of his untreated psychosis" may limit the effectiveness of forced medication, (Doc. No. 68 at 4), has little weight. Dr. Cloutier specifically considered his contention, (Doc. No. 58 at 4), and ultimately rejected it. (Id. at 4–5 (acknowledging that "[f]actors suggesting poor prognosis include lack of insight into . . . duration of untreated psychosis" and concluding "[w]ith reasonable medical certainty . . . that: [a]dministration of involuntary antipsychotic medication to Mr. Hickman is substantially likely to render him competent to stand trial . . . ."). There is clear and convincing evidence that involuntary medication is substantially likely to render Hickman competent to stand trial.

### 2. Involuntary Medication is Unlikely to Have Side Effects that Will Interfere with the Defendant's Ability to Assist Counsel.

Although there are very serious risks associated with taking antipsychotic medications, according to Dr. Cloutier, "[a]dministration of involuntary antipsychotic medication to Mr. Hickman . . . is substantially unlikely to interfere with his ability to assist his counsel." (Doc. No. 58 at 5). Dr. Mukhin identified several side effects associated with the medications recommended to restore Hickman's competency, including weight gain, fatigue, drowsiness, nausea, constipation, increased blood glucose levels, dyskinesias, drug-induced Parkinsonism, involuntary muscle movements, cardiac arrythmia, neuroleptic malignant syndrome, and restlessness. Of these, "[t]he most probable and concerning would be neuromuscular side effects . . . ." (Doc. No. 58 at 4). Dr. Mukhin testified that neuromuscular side effects like dyskinesias, are rare. Dr. Cloutier also found such side effects unlikely, highlighting their low incidence rates. (Doc. No. 58 at 9–10 (stating that acute dystonic reactions "can occur in 2% to 10% of patients", drug-induced parkinsonism "can occur in 15% to 50% of individuals treated with some antipsychotic medications", dyskinesias has a "lifetime incidence . . . in patients with schizophrenia treated with antipsychotics . . . reported to be between 11% to 32%", and akathisia has a "lifetime risk . . . as high as 20% to 30%")). Both doctors found life-threatening side effects, including cardiac arrythmia and neuroleptic malignant syndrome, to be exceedingly rare. Dr. Cloutier's states that "the incidence rates for neuroleptic malignant syndrome range from 0.01% to 0.02% among individuals treated with antipsychotic medicine." (Doc. No. 58 at 11). Dr. Mukhin also testified that the rate of sudden death by cardiac arrythmia in the general population, which is 7 to 10 occurrences per 10,000 people, rises only to 10 to 29 occurrences per 10,000 people for those treated with antipsychotic medications.

Ultimately, the treatment plan's inclusion of monitoring, administering the lowest effective dose, and adjunctive medications severely reduces the risk posed by <u>all</u> side effects. (See Doc. No. 58 at 4–6, 10). According to Dr. Mukhin, any immediate short-term symptom can easily be treated, significantly reducing any risk to Hickman. The Court finds the reports of Drs. Cloutier and Mukhin rational and logical and Dr. Mukhin's testimony is persuasive concerning the potential side effects of antipsychotic medication. Accordingly, the Court concludes that there is clear and convincing evidence that involuntary medication is substantially unlikely to have side effects that will significantly interfere with Hickman's ability to assist his counsel. Mindful of the *potential* side effects that could occur in this case, however, the Court will still include several restrictions on the authorized treatment to restore Hickman's competency.

C. <u>Involuntary Medication is Necessary to Further These Interests</u>

"Third, the court must conclude that involuntary medication is *necessary* to further those interests," and "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." <u>Sell</u>, 539 U.S. at 181. Without providing any evidentiary support, Hickman argues that he should be subject to involuntary psychoeducational therapy before involuntary medication. (Doc. No. 68 at 4–5). He suggests that if he were required to attend therapy, "he would voluntarily agree to take medication." (<u>Id.</u> at 4). Although less intrusive, Hickman's proposed alternative is not viable.

Dr. Mukhin testified that antipsychotic medication is necessary to restore Hickman's competency. She specifically considered less intrusive treatments, including individual and group therapies, and rejected them as futile if not combined with the administration of antipsychotic medication. Dr. Cloutier agreed that "less intrusive treatments [we]re very unlikely to achieve the same results." (Doc. No. 58 at 5). The evidence makes clear that Hickman's competency cannot be restored without medication.

13

The Court concludes that there is no medically supported reason to consider alternatives to medication to restore Hickman's competency. The Court finds involuntary medication necessary to further the Government's interest, and no available, less intrusive treatments likely to achieve substantially the same result. The Government has established the third Sell factor by clear and convincing evidence.

D. Involuntary Medication is Medically Appropriate

The fourth and final factor requires the Court to "conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 181. "The specific kinds of drugs at issue may matter here as elsewhere" because "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." Id.

The evidence shows that the recommended medication plan is in Hickman's "best medical interest in light of his medical condition." Sell, 539 U.S. at 181. Dr. Cloutier concluded that this proposed treatment is "clinically appropriate and indicated to treat Mr. Hickman's psychotic illness[,]" and "[w]ithout treatment, [Hickman's] psychosis will worsen." (Doc. No. 58 at 4–5). Dr. Mukhin testified that without involuntary medication, Hickman's delusions and psychotic symptoms would persist or worsen. According to Dr. Mukhin, while restoration of competency via involuntary medication is substantially likely, yet not certain, there is one-hundred percent certainty that Hickman will experience some degree of relief from symptoms of his psychotic illness if medicated.

Hickman takes no position on this factor and concedes that "there has been no testimony or evidence that the [proposed] medication is not medically appropriate given his current diagnosis and physical health condition." (Doc. No. 68 at 5). The Court finds Dr. Cloutier's proposed treatment plan to be medically appropriate and in Hickman's best interest, given that it will seek

14

Hickman's voluntary compliance throughout, closely monitor for any side effects, and adjust treatment options whenever necessary in accordance with the physicians' medical judgment. Accordingly, the Government has established the fourth <u>Sell</u> factor by clear and convincing evidence.

## IV. CONCLUSION

For the foregoing reasons, the Government's Motion for Involuntary Medication to Restore Defendant to Competency (Doc. No. 60) will be granted with conditions identified in the accompanying Order.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE